## NICHOLAS FRANK *v.* DEPARTMENT OF CHILDREN AND FAMILIES
## (AC 32917)

Beach, Alvord and Pellegrino, Js.

Argued November 16, 2011—officially released March 20, 2012

*John R. Williams*, for the appellant (plaintiff).

*John E. Tucker*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, *Benjamin Zivyon*, assistant attorney general, and *Kristle Wachtler*, certified legal intern, for the appellee (defendant).

*Opinion*

ALVORD, J. The plaintiff, Nicholas Frank, appeals from the trial court's decision affirming the determination of the hearing officer of the defendant, the department of children and families, substantiating allegations that the plaintiff emotionally abused a child and placing the plaintiff's name on the central registry of child abusers pursuant to General Statutes § 17a-101k.[1] On appeal,

---

[1] General Statutes § 17a-101k provides: "(a) The Commissioner of Children and Families shall maintain a registry of the commissioner's findings of abuse or neglect of children pursuant to section 17a-101g that conforms to the requirements of this section. The regulations adopted pursuant to subsection (i) of this section shall provide for the use of the registry on a twenty-four-hour daily basis to prevent or discover abuse of children and the establishment of a hearing process for any appeal by a person of the commissioner's determination that such person is responsible for the abuse or neglect of a child pursuant to subsection (b) of section 17a-101g. The information contained in the registry and any other information relative to child abuse, wherever located, shall be confidential, subject to such statutes and regulations governing their use and access as shall conform to the requirements of federal law or regulations. Any violation of this section or the regulations adopted by the commissioner under this section shall be punishable by a fine of not more than one thousand dollars or imprisonment for not more than one year.

"(b) Upon the issuance of a recommended finding that an individual is responsible for abuse or neglect of a child pursuant to subsection (b) of section 17a-101g, the commissioner shall provide notice of the finding, by first class mail, not later than five business days after the issuance of such finding, to the individual who is alleged to be responsible for the abuse or neglect. The notice shall:

"(1) Contain a short and plain description of the finding that the individual is responsible for the abuse or neglect of a child;

"(2) Inform the individual of the existence of the registry and of the commissioner's intention to place the individual's name on the registry unless such individual exercises his or her right to appeal the recommended finding as provided in this section;

"(3) Inform the individual of the potential adverse consequences of being listed on the registry, including, but not limited to, the potential effect on the individual obtaining or retaining employment, licensure or engaging in activities involving direct contact with children and inform the individual of the individual's right to administrative procedures as provided in this section to appeal the finding; and

"(4) Include a written form for the individual to sign and return, indicating if the individual will invoke the appeal procedures provided in this section.

"(c) (1) Following a request for appeal, the commissioner or the commissioner's designee shall conduct an internal review of the recommended finding to be completed no later than thirty days after the request for appeal is received by the department. The commissioner or the commissioner's designee shall review all relevant information relating to the recommended finding, to determine whether the recommended finding is factually or legally deficient and ought to be reversed. Prior to the review, the commissioner shall provide the individual access to all relevant documents in the possession of the commissioner regarding the finding of responsibility for abuse or neglect of a child, as provided in subsection (m) of section 17a-28.

"(2) The individual or the individual's representative may submit any documentation that is relevant to a determination of the issue and may, at the discretion of the commissioner or the commissioner's designee, participate in a telephone conference or face-to-face meeting to be conducted for the purpose of gathering additional information that may be relevant to determining whether the recommended finding is factually or legally deficient.

"(3) If the commissioner or the commissioner's designee, as a result of the prehearing review, determines that the recommended finding of abuse or neglect is factually or legally deficient, the commissioner or the commissioner's designee shall so indicate, in writing, and shall reverse the recommended finding. The commissioner shall send notice to the individual by certified mail of the commissioner's decision to reverse or maintain the finding not later than five business days after the decision is made. If the finding is upheld, the notice shall be made in accordance with section 4-177 and shall notify the individual of the right to request a hearing. The individual may request a hearing not later than thirty days after receipt of the notice. The hearing shall be scheduled not later than thirty days after receipt by the commissioner of the request for a hearing, except for good cause shown by either party.

"(d) (1) The hearing procedure shall be conducted in accordance with the procedures for contested cases pursuant to sections 4-177 to 4-181a, inclusive.

"(2) At the hearing, the individual may be represented by legal counsel. The burden of proof shall be on the commissioner to prove that the finding is supported by a fair preponderance of the evidence submitted at the hearing.

"(3) Not later than thirty days after the conclusion of the hearing, the hearing officer shall issue a written decision to either reverse or uphold the finding. The decision shall contain findings of fact and a conclusion of law on each issue raised at the hearing.

"(e) Any individual aggrieved by the decision of the hearing officer may appeal the decision in accordance with section 4-183. Such individual may

the plaintiff claims that the trial court erred in affirming the decision of the hearing officer because (1) General Statutes § 46b-120 (3)[2] as interpreted by the defendant's policy is unconstitutionally vague as applied to his conduct, and (2) there was not substantial evidence to uphold the substantiation of child abuse and placement of the plaintiff's name on the central registry of child abusers. We conclude that § 46b-120 (3) is unconstitutionally vague as applied to the plaintiff's conduct and, accordingly, reverse the judgment of the trial court as

also seek a stay of the adverse decision of the hearing officer in accordance with subsection (f) of section 4-183.

"(f) Following the issuance of a decision to uphold the finding and absent any stay of that decision issued by the commissioner or the court, the commissioner shall accurately reflect the information concerning the finding in the child abuse and neglect registry maintained pursuant to subsection (a) of this section and shall, in accordance with section 17a-101g, forward to any agency or official the information required to be disclosed pursuant to any provision of the general statutes.

"(g) Any individual against whom a finding of abuse or neglect was substantiated prior to May 1, 2000, and who has not previously appealed such finding, may appeal such finding as provided in this section.

"(h) Records containing unsubstantiated findings shall remain sealed, except that such records shall be made available to department employees in the proper discharge of their duties and shall be expunged by the commissioner five years from the completion date of the investigation if no further report is made about the individual subject to the investigation, except that if the department receives more than one report on an individual and each report is unsubstantiated, all reports and information pertaining to the individual shall be expunged by the commissioner five years from the completion date of the most recent investigation.

"(i) Not later than July 1, 2006, the Commissioner of Children and Families shall adopt regulations, in accordance with the provisions of chapter 54, to implement the provisions of this section."

[2] General Statutes § 46b-120 provides in relevant part: "(3) 'Abused' means that a child or youth (A) has been inflicted with physical injury or injuries other than by accidental means, (B) has injuries that are at variance with the history given of them, or (C) is in a condition that is the result of maltreatment, including, but not limited to, malnutrition, sexual molestation or exploitation, deprivation of necessities, emotional maltreatment or cruel punishment . . . ." We note that the statute has been amended since the time of the conduct at issue in this appeal but because the changes, including the redesignation of subdivisions are not relevant, for convenience we refer to the current revision of the statute.

to both the substantiation of emotional abuse and the placement of the plaintiff's name on the central registry of child abusers.[3]

The following facts and procedural history are relevant to our disposition of the plaintiff's appeal. The plaintiff was a teacher at an elementary school in New Haven. K[4] was a student in the plaintiff's classroom for his fifth and sixth grade years from the fall of 2007 to the spring of 2009. There is no evidence in the record that there were any issues reported regarding K's experience in the plaintiff's classroom for his fifth grade year. During the fall and winter of K's sixth grade year in 2008, K's mother became concerned about his attitude toward school and his in-class experiences, although he had some trouble turning in his assignments beginning in his fifth grade year.[5] K's observed behavioral issues in school included not completing his assignments and refusing to take class tests. K's mother contacted the school principal, Laura Lynn Russo, in December, 2008, in order to speak with Russo, another teacher and the plaintiff regarding troubling events that had transpired in K's childhood and of which K's mother believed the school should be made aware. The plaintiff had an appointment during the time of the scheduled

[3] We conclude that the plaintiff's substantial evidence challenge is inextricably intertwined with his argument that § 46b-120 is unconstitutionally vague as applied to his conduct. See *State* v. *Scruggs*, 279 Conn. 698, 709–10, 905 A.2d 24 (2006).

[4] To protect the privacy interests of the alleged victim, we decline to identify him or others through whom his identity may be ascertained.

[5] The school principal, Laura Lynn Russo, testified at the administrative hearing: "[K's mother] contacted me in November, 2008, she e-mailed me and said she was concerned about some regressions, not getting his assignments in, reluctance to do his homework at home, you know, and she and I talked about it being part of kind of preadolescence, you know, because we were having a lot of unmotivated kids. But she did take special note of the fact that she did not—when he was in second grade he was really emotionally and understandably a mess. She did not want to see him regress emotionally [or] academically so that it overwhelmed him. So, she wanted to let me know that this is what she was seeing."

meeting and was unable to attend. Some days later, Russo informed the plaintiff about the substance of the conversation that took place during the meeting, including relaying information about a traumatic familial event that K experienced earlier in his childhood.

During that same December, 2008 meeting, K's mother told Russo that K had become sensitive to the use of nicknames by the plaintiff, including the name, "cheeks," and, "fish out of water," and to the pinching of his cheeks by the plaintiff.[6] There is no evidence in the record that K or his mother had ever informed the plaintiff at any time prior to December, 2008, that K was sensitive to the plaintiff's joking behavior. At this time, Russo advised the plaintiff to have less contact with K, to stop being playful with him, to stop calling him by any nicknames and to stop pinching his cheeks. Subsequent to this December, 2008 conversation with Russo, the plaintiff complied with Russo's directives. Russo called K's mother in January, 2009, to check in with her. During the conversation, Russo asked K's mother whether K was still having any issues in the plaintiff's classroom and if the behaviors to which K was sensitive had stopped. K's mother indicated to Russo that there was no further issue. According to Russo: "I did call [K's] mom a week later because we've had history as far as, you know, a good relationship, asking her if it had stopped, [if K] was reporting anything to her, and she said no. He had said that it had stopped. She asked him every day."[7]

---

[6] The plaintiff maintained a "light and cool" atmosphere in his classroom, which atmosphere he employed to bond with his students. The plaintiff had nicknames for some of his students, including K, whom he called "cheeks" and another girl whom he gave the nickname, "skittle." Prior to December, 2008, the plaintiff admitted to pinching K's cheeks in a joking manner on a regular basis, referring to him as "cheeks" and occasionally calling him other names such as a "fish out of water" when K would lie on the floor to get books out from underneath his desk.

[7] Additionally, the following colloquy took place upon cross-examination of Russo:

"[The Witness]: We felt that mom—we did the investigation and did not feel the kids were in danger. I do feel that he did not—

In February, 2009, progress reports from the third marking period were released, including K's grade in the plaintiff's class. K received a grade that was lower than average for him in the plaintiff's class, and the plaintiff provided detailed documentation showing that K had not turned in all of his assignments, leaving the plaintiff with little choice but to lower his grade accordingly. K's mother was very upset and called Russo to discuss the situation. During their conversation, K's mother told Russo that she believed K's grade in the plaintiff's class was lowered in retaliation because she had complained about the plaintiff's classroom behavior at the December, 2008 meeting.[8] K's mother insisted

"[The Defendant's Counsel]: He—

"[The Witness]: [The plaintiff] did not realize how sensitive [K] was. I didn't think anyone was totally in danger.

"[The Defendant's Counsel]: But you had spoken to him in December to tell him to draw the line. You found that he had no intent, but you told him that he had to draw the line and that [K] was uncomfortable.

"[The Witness]: Right.

"[The Defendant's Counsel]: And at that time you shared with him that K had a [past history of trauma]?

"[The Witness]: Right. I did.

"[The Defendant's Counsel]: . . . So, when the behavior continued, is that when you decided to contact [the defendant]?

"[The Witness]: It didn't continue."

[8] The following colloquy took place between the plaintiff's counsel and Russo:

"[The Plaintiff's Counsel]: That's okay. All right. So, from January of 2009—and she, the mom, was indicating to you that [K] was doing okay. Did that ever change?

"[The Witness]: Well, it didn't change until she got this progress report.

"[The Plaintiff's Counsel]: When did that happen?

"[The Witness]: And his grades. Right around, right before the April break, so right around March, February-March was the progress report. . . . And she wasn't happy with his language arts grade. None of us were. It certainly wasn't his regular profile.

"[The Plaintiff's Counsel]: Okay. And what did she do when she got the progress report?

"[The Witness]: Well, she called me, and I told her I talked to [the plaintiff] about what it was that was missing, but he had an itemized form for the program that he personally has about the assignments. Most of it was assignments that he was missing. So—but she was upset about that. I mean she was very angry and she felt that that was kind of in retaliation. But a lot

that Russo take action. Russo assured K's mother that she would investigate the matter by looking over all of K's grades and assignments, which, in fact, the plaintiff already had provided to K's mother for her own review.

In April, 2009, K's mother brought K to school and had a conversation with the plaintiff regarding an issue that K was having with some other students in the classroom. K's mother became very upset and went to find Russo, who was not in the school at the time because she was at an administrators' meeting. K's mother then proceeded to the school system's central office to complain and was referred to Daniel Diaz, the parent's advocate. A meeting was subsequently scheduled on May 5, 2009, with Russo, Diaz, K's mother, the plaintiff and Charles Warner, a director at the central office. During that meeting, K's mother began to complain about K's grade, accusing the plaintiff of bullying K based on his behavior from the fall and accusing the plaintiff of lowering K's grade because of the complaints of K's mother. Despite the fact that school officials again allowed her to fully air her concerns and continued to explain their actions with regard to K, K's mother became increasingly agitated, demanding that the plaintiff be removed from his teaching post. Warner stood up and ended the meeting early, informing K's mother that if she had a problem with the plaintiff improperly touching her son's cheeks, then she should file a police report. Following the meeting, K's mother went directly to the police station to file a report. The police visited the school and interviewed the plaintiff and Russo, but declined to investigate the allegations further.

An additional meeting was scheduled on May 19, 2009, at the school with K's mother, the plaintiff, Russo,

---

of time had gone by, but she made it clear to me that she thought that's what it was. The more I told her I didn't think it was, she, you know, she was upset, thought I was, you know, defending the teacher, but I told her I needed to do an investigation. I would sit down and look at all his grades and the assignments. And she was—and he had given her a copy of it, too."

Andrea Lobo-Wadley, the school system's personnel director, and Leida Pacini, the chief of staff in the central office. At the end of this meeting, the school administration put the plaintiff on administrative leave pending further investigation into the accusations of K's mother. Russo subsequently conducted her own investigation. Following Russo's investigation, Lobo-Wadley conducted an additional investigation.[9] Despite these two investigations, K's mother told Russo that she believed that the school was protecting the plaintiff.[10] In order to prove to K's mother that the school was serious about an independent investigation, Russo made a referral to the defendant on behalf of K's mother on May 19, 2009. The defendant denied the referral.[11] K's mother

[9] On May 20, 2009, after the plaintiff was placed on leave, K's mother complained that a different teacher, whom she asserted was involved in a romantic relationship with the plaintiff, had retaliated against K for acting out in her class. A third teacher, who had been present at the original meeting about K's behavior in December, 2008, was placed on administrative leave pending investigation after K's mother complained about him. It is unclear whether the defendant investigated these allegations of bullying and abuse against the other teachers.

[10] Russo testified: "We had an investigation, and I felt that—two reasons. One, because of who [K] was with his history and how his mom was being very passionate and very deliberate about it, that she would not—she was at that point not trusting the school, that we were protecting [the plaintiff], to which I said to her we were not. So, I filed it, one to also get an independent investigation. We did ours. I also—we also had our personnel director do it. So, it wasn't just me. I did my investigation. The personnel director came. Mom was still not happy, okay?"

[11] The defendant's policy § 33-6-14 states that the criteria utilized to accept a report of child abuse includes: the alleged victim is under 18 years of age, or under 21 years of age and a department client, the child's injuries were alleged to be inflicted by a person responsible for the child's care or by a person given access to the child by a person responsible for the child's care, there is sufficient information to locate the child, and *the allegation meets the statutory definitions of abuse, neglect, or in danger of abuse.* Dept. of Children and Families Policy Manual § 33-6-14. By definition then, reports of abuse that are denied by the department do not meet these departmental criteria. K is clearly under age 18, the plaintiff was clearly responsible for his care while he was in the plaintiff's classroom and there was clearly sufficient information to locate K. The only explanation then for the defendant's repeated rejection of the referrals, therefore, was that the defendant *did not believe that the allegations met the statutory definition of abuse.*

subsequently made two referrals to the defendant on her own, which the defendant also denied.[12]

Based on Lobo-Wadley's independent investigation, the school system scheduled a hearing on June 2, 2009, at the personnel office of the New Haven public schools. After the hearing, the superintendent of schools, Reginald Mayo, informed the plaintiff via letter that he would be suspended without pay for eight days beginning June 17, 2009. That letter stated: "As you are aware, a formal hearing was held to discuss allegations brought by several parents that you frequently bully students. The allegations were reported to the Department of Children and Families and the New Haven Police Department. However, the allegations did not rise to the investigative level by both institutions and therefore the district conducted its own investigation.

"As a result of the investigation, it was discovered that you frequently joke with your students and at times identify them by nicknames. It was further determined that the majority of your students respect you and find you to be a good teacher. Your students genuinely believe that your jokes or nicknames are in fun and not intended to hurt them. However, it is clear that you exercised poor judgment by going too far on several occasions with students.

"Therefore, as a result of the findings and your own admissions that you used poor judgment, you are hereby suspended without pay for (8) eight business days. The suspension dates are June 17, 2009 through June 26, 2009. Additionally, as discussed you will participate in a mandatory supervised referral with our Employee Assistance Program and you are required to comply with the EAP program recommendations.

"Going forward let me remind you that you are an adult and a role model and you must conduct yourself

---

[12] See footnote 11 of this opinion.

in a professional manner at all times. Furthermore, our students are here to learn and the atmosphere must always be that of teaching and learning. Let me be clear that in the future such behavior will not be tolerated. Failure to comply as directed may result in further disciplinary action up to and including termination." On June 10, 2009, the plaintiff received notice that he would be transferred to another school building when he returned the following fall.

The defendant declined to investigate the accusations of K's mother of emotional abuse by the plaintiff despite three successive referrals. On June 23, 2009, the New Haven Register reported about the situation at the school, including the placement of the plaintiff, and the other teacher about whom K's mother had complained, on administrative leave. The article stated: "Both incidents were referred to the [defendant]. Officials there determined the allegations against [the plaintiff and a second teacher at the school] did not warrant investigations by their agency, according to school records." The very next day following the publication of the article, the defendant advised the New Haven public schools that it had finally accepted a referral, made on the day of the article's publication, and would be conducting an investigation into the allegations that the plaintiff had bullied and emotionally abused K. K's mother was identified as the person making that final referral on June 23, 2009.

On June 24, 2009, Brooke Morris, an investigator for the defendant, contacted Lobo-Wadley, who informed Morris that the plaintiff had been placed on administrative leave. Morris also contacted Russo, who informed Morris that the students in the school were well aware of the content of the newspaper article and had been acting out as a result of the article. Russo informed Morris that Lobo-Wadley already had completed an investigation prior to the plaintiff's suspension and prior

to the article's publication. The following day, Morris interviewed K and his mother in addition to six of K's sixth grade classmates. During the summer of 2009, Morris substantiated a finding of emotional abuse/maltreatment against the plaintiff and recommended his placement on the central registry of child abusers. The plaintiff was notified of the defendant's decision by letter dated October 30, 2009.

The defendant held an administrative hearing in the defendant's New Haven area office on December 21, 2009, and March 15, 2010, to determine whether to uphold the investigator's substantiation. The hearing officer heard testimony from Morris, Russo and the plaintiff and admitted the investigation protocol, the newspaper article and the plaintiff's personnel record into evidence. On April 30, 2010, the hearing officer rendered her final decision, upholding the substantiation against the plaintiff and ordering the placement of his name on the defendant's central registry of child abusers.

The plaintiff timely appealed from the hearing officer's determination to the trial court, which heard argument on November 10, 2010. In a memorandum of decision filed November 22, 2010, the court affirmed the decision of the hearing officer, finding that there was substantial evidence to support the hearing officer's decision and rejecting the plaintiff's void for vagueness challenge. This appeal followed.

I

The plaintiff claims that § 46b-120 is unconstitutionally vague as applied to his conduct because the statute and associated policies of the defendant provided no notice that horseplay in the form of nicknames and cheek pinching amounted to emotional abuse/maltreatment of K in the educational context.[13] We agree.

_____

[13] We ordinarily do not reach constitutional claims if an appeal can be resolved on other grounds; however, as noted in footnote 3 of this opinion,

We first set forth the relevant legal principles. "A statute . . . [that] forbids or requires conduct in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. . . . Laws must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly." (Citations omitted; internal quotation marks omitted.) *State* v. *Cavallo*, 200 Conn. 664, 667, 513 A.2d 646 (1986).

"The void for vagueness doctrine is a procedural due process concept that originally was derived from the guarantees of due process contained in the fifth and fourteenth amendments to the United States constitution. . . . The constitutional injunction that is commonly referred to as the void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . For statutes that do not implicate the especially sensitive concerns embodied in the first amendment, we determine the constitutionality of a statute under attack for vagueness by considering its applicability to the particular facts at issue. . . .

"The proper test for determining [whether] a statute is vague as applied is whether a reasonable person

we consider the substantial evidence claim asserted by the plaintiff to be inextricably intertwined with his claim that § 46b-120 (3) is void for vagueness as applied to his conduct. In addition to the overlap of these issues in this case, we conclude that if § 46b-120 (3) is void for vagueness as to the plaintiff's conduct, the constitutional infirmity could not be cured by a conclusion that the agency's findings were supported by substantial evidence on the whole record. See *State* v. *Scruggs*, 279 Conn. 698, 708–709, 905 A.2d 24 (2006); cf. *State* v. *Casiano*, 282 Conn. 614, 616 n.3, 922 A.2d 1065 (2007); *State* v. *Smith*, 280 Conn. 285, 295 n.6, 907 A.2d 73 (2006).

would have anticipated that the statute would apply to his or her particular conduct. . . . The test is objectively applied to the actor's conduct and judged by a reasonable person's reading of the statute . . . . [O]ur fundamental inquiry is whether a person of ordinary intelligence would comprehend that the defendant's acts were prohibited . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Stuart*, 113 Conn. App. 541, 560–62, 967 A.2d 532, cert. denied, 293 Conn. 922, 980 A.2d 914 (2009).

## II

We address two arguments made by the defendant before considering the substance of the plaintiff's argument. The defendant first asserts that the plaintiff's argument is foreclosed by our Supreme Court's decision in *Hogan* v. *Dept. of Children & Families*, 290 Conn. 545, 964 A.2d 1213 (2009). This case is not governed by *Hogan*.

In *Hogan*, the plaintiff challenged the statutory scheme of the central registry pursuant to § 17a-101k as unconstitutionally overbroad and vague *as written*, whereas the plaintiff in the present case challenges § 46b-120 (3) as unconstitutionally vague *as applied to his* conduct. This distinction is of paramount importance to our disposition of the plaintiff's appeal in the present case and is the reason this opinion is not out of step with our Supreme Court's decision in *Hogan*. The plaintiff here does not challenge the constitutionality of § 46b-120 (3) as written and, therefore, *Hogan* is inapposite. In fact, our Supreme Court recently approvingly revisited its analysis in *State* v. *Scruggs*, 279 Conn. 698, 905 A.2d 24 (2006), in which the court found General Statutes § 53-21 (a) (1) void for vagueness in the *as applied* context. See *State* v. *Maurice M.*, 303 Conn. 18, 41–42, 31 A.3d 1063 (2011).

The defendant next asserts that we should consider the defendant's behavior in light of General Statutes (Rev. to 2007) § 10-222d.[14] We are not persuaded. First, this bullying statute does not regulate teacher-student bullying but rather student-student bullying. Second, the plaintiff's behavior clearly does not fit within the statutory scheme. Even if the statute hypothetically could be attenuated to apply to a teacher-student situation, bullying is defined in the statute as "any overt acts" directed to a student "with the *intent* to ridicule, harass, humiliate or intimidate" while on school

[14] General Statutes (Rev. to 2007) § 10-222d provides in relevant part: "Each local and regional board of education shall develop a policy, for use on and after February 1, 2003, to address the existence of bullying in its schools. Such policy shall: (1) Enable students to anonymously report acts of bullying to teachers and school administrators and require students to be notified annually of the process by which they may make such reports, (2) enable the parents or guardians of students to file written reports of suspected bullying, (3) require teachers and other school staff who witness acts of bullying or receive student reports of bullying to notify school administrators, (4) require school administrators to investigate any written reports filed pursuant to subdivision (2) of this section and to review any anonymous reports, (5) include an intervention strategy for school staff to deal with bullying, (6) provide for the inclusion of language in student codes of conduct concerning bullying, (7) require the parents or guardians of students who commit any verified acts of bullying and the parents or guardians of students against whom such acts were directed to be notified, (8) require each school to maintain a list of the number of verified acts of bullying in such school and make such list available for public inspection, and (9) direct the development of case-by-case interventions for addressing repeated incidents of bullying against a single individual or recurrently perpetrated bullying incidents by the same individual that may include both counseling and discipline. The notification required pursuant to subdivision (7) of this section shall include a description of the response of school staff to such acts and any consequences that may result from the commission of further acts of bullying. For purposes of this section, 'bullying' means any overt acts by a *student or a group of students directed against another student* with the intent to ridicule, harass, humiliate or intimidate the other student while on school grounds, at a school-sponsored activity or on a school bus, which acts are repeated against the same student over time. Such policies may include provisions addressing bullying outside of the school setting if it has a direct and negative impact on a student's academic performance or safety in school."

grounds. (Emphasis added.) General Statutes (Rev. to 2007) § 10-222d. The defendant concedes the existence of the intent element in its brief. The hearing officer did not find that the plaintiff ever had an intent to ridicule, harass, humiliate or intimidate K. In fact, the hearing officer found directly to the contrary: "The students reported they believed the [plaintiff] was joking, but that sometimes he went too far and hurt students' feelings and embarrassed them." Accordingly, the defendant's argument fails.

## III

We now address the plaintiff's argument that § 46b-120 (3), as interpreted by the defendant's policy, is unconstitutionally vague as applied to his conduct because he could not have known that his behavior would fit within the defendant's definition of emotional abuse of a student by a teacher in the educational context. The plaintiff claims that construction of the statute and of the defendant's policy must "permit latitude for ordinary teacher-student interactions, including criticism, correction, punishment, encouragement, bonding and playfulness." In making his argument, the plaintiff analogizes this case to our Supreme Court's decision in *State* v. *Scruggs*, supra, 279 Conn. 698, in that a person of common intelligence would not be able to discern where the line between potentially harmful but lawful conduct and unlawful conduct lies in this context. Specifically, he argues that the statute itself and its interpretation by the defendant do not provide notice to a teacher that joking behavior in the course of teaching in the classroom that unintentionally upsets a sensitive student could lead the defendant to substantiate a finding against that teacher of emotional abuse and lead to his placement on the central registry of child abusers. We therefore examine *Scruggs* to determine whether the analysis therein is applicable to the present case.

## A

In *Scruggs*, our Supreme Court determined that § 53-21 (a) (1)[15] was unconstitutionally vague as applied to the defendant, a mother who had been charged with placing her child in a situation that endangered his health. Id., 700. The defendant's child, Daniel, had been relentlessly bullied at school. Id., 701. Daniel had poor hygiene, occasionally defecated in his pants and slept in his bedroom closet armed with knives and a homemade spear to protect himself. Id. The defendant had been working with the department of children and families to have Daniel placed in a different school and, in the course of its investigation, the department had performed an inspection of the defendant's home. Id. The department subsequently closed its file on Daniel. Id. Several days after the file was closed, Daniel hanged himself in his bedroom closet. Id.

Following the incident, the Meriden police department entered the defendant's apartment and observed that it was extremely cluttered and had an unpleasant odor. Id. After the police department investigation, the state charged the defendant with endangering the welfare of a child. The jury found the defendant guilty on one count of "willfully or unlawfully [causing] or [permitting] a child under the age of sixteen years to be placed in such a situation that the health of such child was likely to be injured . . . [by] providing a home living environment that was unhealthy and unsafe in violation of § 53-21 (a) (1) . . . ." (Internal quotation marks omitted.) Id., 702. The defendant filed a postverdict motion for a judgment of acquittal. Id., 703. In

---

[15] General Statutes § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony . . . ."

denying the motion, the court found that although there was no evidence to support a finding that the defendant's conduct was likely to cause injury to a child's physical health, the jury reasonably could have found that the conditions in the defendant's apartment were likely to cause injury to a child's mental health. Id.

During the trial, "[t]he state's witnesses . . . described the apartment as very messy and cluttered. [A witness] said the apartment was 'extremely messy and dirty, very cluttered' and had a 'chaotic atmosphere.' He said 'it wasn't an easy place to walk through . . . . [Y]ou had to watch your step everywhere you went and [make] sure that you stayed on your feet' because of clothing and other articles piled everywhere on the floors throughout the house. He further testified that he saw dust accumulated on the top of various items. [Another witness] also said that the clutter made the apartment hard to walk through, with only an eighteen inch path between piles of debris from the front door to the kitchen. He said he could not even see the floor surface in Daniel's bedroom because of debris on the floor, some piled as high as the bed. When [the witness] walked into the bedroom, he had to step on clothing and heard items cracking and breaking underneath. The police had to clear a path in the bedroom for the medical examiner's investigator to walk to the closet where Daniel's dead body lay." Id., 704.

The defendant claimed that the statute was unconstitutionally vague as applied to her because it did not provide her with adequate notice of the line dividing lawful conduct from unlawful conduct in that particular context. Id., 713. Specifically, she claimed that the statute provided no notice that poor housekeeping may be a criminal offense and that the evidence was insufficient to support her conviction of risk of injury to a child because, without expert testimony, the jury had no basis

on which to conclude that the conditions in her apartment were likely to cause a mental health injury to the child. Id., 708.

Our Supreme Court first determined that the trial court improperly applied a subjective standard instead of an objective standard in determining that the defendant should have known that the conditions in her apartment were likely to injure Daniel's mental health. Id., 716–17. "The trial court appears to have recognized the difficulty in discerning the line between lawful and unlawful conduct in this context. Nevertheless, the court implicitly determined that the jury reasonably could have concluded that the defendant should have known that the extreme clutter and unpleasant odor in her apartment created a situation that was well on the wrong side of that line, particularly in light of Daniel's 'troubled and fragile' state of mind. We have concluded, however, that the state was obligated to prove beyond a reasonable doubt that the defendant knew or should have known that the conditions would constitute a risk of injury to the mental health of *any* child. Although the defendant reasonably could have been aware that the conditions were not optimal, we are not persuaded that the nature and severity of the risk were such that the defendant reasonably could not have believed that they were within the acceptable range.

"Moreover, although the trial court recognized that the evidence showed that employees of the department had inspected the defendant's apartment during late 2001, and had closed its file on the family only days before Daniel's suicide, it failed to draw the critical inference that the only experts in child safety who had knowledge of the conditions in the defendant's home during the relevant period apparently had concluded that they were *not* so deplorable as to pose an immediate threat to Daniel's mental health. We do not suggest that the department's failure to take action constituted

*conclusive* evidence that the conditions in the apartment did not pose a risk of injury to the mental health of a child. It does constitute evidence, however, that the conditions in the apartment did not pose such an obvious risk that it would be within the knowledge of an ordinary person. . . .

"[T]he jury unavoidably was made aware during trial that Daniel had exhibited a variety of strange behaviors, was frequently emotionally upset and ultimately had killed himself. There were several possible explanations for Daniel's state of mind and behavior, however, including the relentless bullying that he endured at school and his inherently fragile psyche. Even if it is assumed that the state fairly could rely on evidence of Daniel's suicide to prove that the conditions in the apartment in fact caused injury to Daniel's mental health, that evidence was not competent to prove that such harm was foreseeable. As we have suggested, actual effects are not necessarily foreseeable effects." (Emphasis in original.) Id., 720–22.

Finally, our Supreme Court concluded that "[w]e are mindful that § 53-21 (a) (1) is broadly drafted and was intended to apply to any conduct, illegal or not, that foreseeably could result in injury to the health of a child. We do not rule out the possibility that a home environment could be so squalid that an ordinary person should be expected to know that it poses a risk to the mental health of a child. . . . [But] [w]e cannot conclude that the defendant was on notice that [the conditions in her apartment] were so squalid that they posed a risk of injury to the mental health of a child within the meaning of § 53-21 (a) (1). Accordingly, we conclude that the statute is unconstitutionally vague as applied to the defendant's conduct." Id., 724–25.

### B

After careful review, we agree with the plaintiff that our Supreme Court's decision in *Scruggs* is instructive

and that its analysis should guide our disposition of the present case.[16] Accordingly, we must conclude that § 46b-120 (3) is unconstitutionally vague as applied to the plaintiff's conduct in the classroom regarding K, because the plaintiff could not have been on notice that his behavior could be considered emotional abuse as defined by the defendant's regulations.

First, the hearing officer in the present case improperly applied a subjective rather than an objective standard in determining that the behavior of the plaintiff amounted to emotional abuse of K. As our Supreme Court determined in *Scruggs* with regard to that trial court, we conclude that the hearing officer in the present case was required to determine whether the plaintiff's behavior would have constituted emotional abuse as to *any* child, not just to a particularly sensitive child

---

[16] We recognize that *Scruggs* related to a different statutory scheme, but we find many parallels between the two schemes. Both statutes relate to the protection of children from abuse and neglect, although one is civil and the other criminal. We recognize that "[t]he [United States Supreme Court] has . . . expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. . . . Therefore, [c]ivil statutes . . . may survive a vagueness challenge by a lesser degree of specificity than in criminal statutes." (Citation omitted; internal quotation marks omitted.) *Hogan* v. *Dept. of Children & Families*, supra, 290 Conn. 575. We note, however, that the plaintiff does face serious consequences, including the permanent loss of his teaching license and livelihood and the destruction of his pedagogical and personal reputation through the placement of his name on the central registry of child abusers.

In *Williams* v. *Ragaglia*, 261 Conn. 219, 232, 802 A.2d 778 (2002), our Supreme Court stressed the long-standing protection of a person's good name in the state of Connecticut, stating: "Courts have long recognized the importance of being able to maintain one's own good name. [T]he individual's right to the protection of his own good name reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. . . . Indeed, the citizens of this state have placed such value on one's interest in his or her reputation as to afford it constitutional protection. See Conn. Const., art. I, § 10 ([a]ll courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay)." (Citations omitted; internal quotation marks omitted.)

when the plaintiff had no prior knowledge of the child's sensitivity.

K had a traumatic history making him particularly vulnerable to teasing behavior. The plaintiff, who had never had a problem with K during his fifth grade year, was unaware of K's past trauma and resulting sensitivity. In attempting to keep his classroom "light and cool," the plaintiff unwittingly upset K. The hearing officer's findings show that the plaintiff intended his nicknames and horseplay to be taken in a joking manner, and that is how K's classmates interpreted the plaintiff's actions, although the hearing officer noted that some students reported that "sometimes [the plaintiff] went too far and hurt students' feelings and embarrassed them." K's mother met with Russo and some other members of the school in December, 2008, to report that K was not doing well in school and to make the school aware of K's traumatic history. The plaintiff was informed shortly after the meeting took place that K had a traumatic history and that he had become increasingly sensitive to the plaintiff's previous horseplay with him. There is absolutely no evidence in the record that any name-calling or cheek pinching by the plaintiff took place after he was informed of K's history. In fact, when Russo called K's mother in January, 2009, to ask her if the behavior had continued, she said that the behavior had stopped and that she asked K every day whether the behavior was still going on and he said no.[17]

---

[17] It was not until the plaintiff informed K's mother that K's grade in his class had been lowered because of K's failure to turn in his assignments that K's mother complained further about the plaintiff. Despite the renewal of the complaints of K's mother, no evidence in the record supports that the plaintiff continued the cheek-pinching and name-calling behavior after he learned of K's past history in December, 2008. Russo testified: "So, what we decided from personnel . . . is that since, yes, we were going to certainly, you know, talk to him again about what's happening, but from that time on when I first spoke to [K's mother], and I spoke to her, and she said there was no more instances, we were fine. It wasn't until [K] got a poor grade—and I'm not saying it's that trivial, but I'm just saying, the progression of things."

Under these circumstances, the plaintiff could not have had notice that his behavior would have adversely affected K to the extent that his actions would qualify as emotional abuse. Additionally, the defendant did not prove that the plaintiff's classroom behavior would amount to emotional abuse of *any* child. In fact, the hearing officer's findings make reference to several other children with whom the defendant engaged in similar horseplay as with K. In the investigation protocol, the investigator noted that K reported that the plaintiff "would [make fun of] many of the students in the classroom, he did not do it to just one person." As far as this court is aware, none of the other children in the plaintiff's classroom or in the school has been adversely affected by the plaintiff's behavior as defined by the defendant's regulations. No allegations have been made accusing the plaintiff of emotionally abusing any other children.

There is more than one possible explanation for K's state of mind during the relevant time period. It was acknowledged that a subsequent traumatic familial event, related to the earlier event K experienced, occurred during his sixth grade year. Even if the plaintiff's behavior negatively affected K in some capacity, the adverse impact described in the investigation protocol and in the hearing officer's findings do not show that the plaintiff's behavior was the sole or even the primary cause of K's adverse effects or that it was foreseeable that the plaintiff's behavior would cause the type of adverse effects that K experienced.[18] As our

We note that Russo testified at the administrative hearing that despite being out of the plaintiff's classroom and the plaintiff's absence from the school environment, K was "still not handing in assignments" as of the last progress report in the fall of 2009.

[18] Like in *Scruggs*, there was no expert testimony presented on the issue of causation in the present case. As in *Scruggs*, the presentation of expert testimony in the present case would not have cured the constitutional infirmity in the application of the statute to the plaintiff's conduct. See *State* v. *Scruggs*, supra, 279 Conn. 709. The lack of an expert in this case, however, is concerning. While we do not expect that expert testimony will always

Supreme Court has suggested, "actual effects are not necessarily foreseeable effects." *State* v. *Scruggs*, supra, 279 Conn. 722.

We next examine whether an ordinary person of average intelligence would be capable of determining whether the plaintiff's behavior fell within accepted norms of teacher behavior. The *Scruggs* court acknowledged that "there may be generally accepted housekeeping norms and that it may be common knowledge that, all things being equal, a clean and orderly home is preferable to a dirty and cluttered home. The same could be said of any number of conditions and actions that affect a child's well-being. It may be common knowledge, for example, that drinking milk is healthier than a constant diet of soft drinks, reading books is preferable to constant exposure to television programs, large cars are safer than small cars, playing computer games is safer than riding a bicycle, and so on. All of these comparisons, however, involve virtually infinite gradations of conduct, making it extremely difficult, if not impossible, for an ordinary person to know where the line between potentially harmful but lawful conduct and unlawful conduct lies or, indeed, whether that line exists at all." Id., 719–20.

Similarly, there are generally accepted norms of teacher behavior in the classroom, but as our Supreme Court has cautioned, defining educational norms and reviewing the soundness of educational instruction is a project that the judiciary is ill equipped to undertake.

---

be required on the issue of the causation of adverse effects in a child abuse investigation, in this case, where K had a traumatic history that could have been an alternate explanation for his adverse effects, an expert was warranted. In fact, the hearing officer accepted K's own declaration that "[K] identified that his [adverse effects] were caused by his feeling bullied and always thinking about what is happening in the classroom." A twelve year old child, such as K, is not qualified to make determinations about the causation of his psychological sequelae. Without proof of causation in the present case, the defendant's determination cannot stand.

See *Gupta* v. *New Britain General Hospital*, 239 Conn. 574, 590, 687 A.2d 111 (1996). In *Scruggs*, our Supreme Court determined that the department of children and families' investigators were the experts in child safety in the home and that the department of children and families had already conducted its own investigation and determined that no further inquiry was necessary into Daniel's living situation prior to the police department investigation. *State* v. *Scruggs*, supra, 279 Conn. 721–22. In the present case, the educational experts in the school system had already conducted *two* independent investigations of K's allegations and had been working assiduously with K's mother for some time prior to the defendant's involvement with the case.[19] The school system already had meted out discipline to the plaintiff by suspending him for eight days without pay and had closed the case after informing the plaintiff that he would be transferred to a new school in the fall. If the school system administration had determined that the plaintiff had emotionally abused K, the New Haven board of education could have terminated his employment under the well established statutory scheme regarding the termination of tenured teachers' employment, but the administration did not seek to terminate the plaintiff's employment. See General Statutes § 10-151 (d).[20]

---

[19] We note that the defendant, after previously rejecting the reports of K's mother of the plaintiff's alleged abuse, became involved the day following the publication of an article in the local newspaper and began conducting its own investigation by interviewing students in K's class after the newspaper article had been widely distributed amongst the school's student body. The investigations by Russo and Lobo-Wadley, however, were each conducted long prior to the article's publication.

[20] General Statutes § 10-151 (d) provides in relevant part: "The contract of employment of a teacher who has attained tenure shall be continued from school year to school year, except that it may be terminated at any time for one or more of the following reasons: (1) Inefficiency or incompetence, provided, if a teacher is notified on or after July 1, 2000, that termination is under consideration due to incompetence, the determination of incompetence is based on evaluation of the teacher using teacher evaluation guidelines established pursuant to section 10-151b; (2) insubordination against

The school system's administration, including the school's principal and the superintendent, however, did not contend that K was being emotionally abused by the plaintiff. In a letter to the plaintiff, the superintendent of schools wrote: "As a result of the [school system's] investigation, it was discovered that you frequently joke with your students and at times identify them by nicknames. It was further determined that the majority of your students respect you and find you to be a good teacher. Your students genuinely believe that your jokes or nicknames are in fun and not intended to hurt them. However, it is clear that you exercised poor judgment by going too far on several occasions with students."

The fact that the school system determined that the plaintiff did not emotionally abuse K would not necessarily be conclusive evidence that the plaintiff did not emotionally abuse K. This determination does serve to show, however, that his behavior did not pose such an obvious risk of causing adverse effects to K that it would be within the knowledge of an ordinary person. If school officials did not believe that the plaintiff's behavior amounted to emotional abuse, the plaintiff could not have been expected to be on notice that his behavior constituted such abuse. In fact, when the plaintiff was told that his behavior made K uncomfortable and upset in December, 2008, the plaintiff's behavior stopped.

An argument could be made that the plaintiff's behavior was not appropriate for the classroom. This court

reasonable rules of the board of education; (3) moral misconduct; (4) disability, as shown by competent medical evidence; (5) elimination of the position to which the teacher was appointed or loss of a position to another teacher, if no other position exists to which such teacher may be appointed if qualified, provided such teacher, if qualified, shall be appointed to a position held by a teacher who has not attained tenure, and provided further that determination of the individual contract or contracts of employment to be terminated shall be made in accordance with either (A) a provision for a layoff procedure agreed upon by the board of education and the exclusive employees' representative organization, or (B) in the absence of such agreement, a written policy of the board of education; or (6) other due and sufficient cause. . . ."

makes no pronouncements on the proper methods for school teachers to manage their classrooms, engage their students and meet educational goals. As President Dwight D. Eisenhower wisely noted: "[F]arming looks mighty easy when your plow is a pencil, and you're a thousand miles from the corn field."[21] We are mindful, however, that our Supreme Court has recently reiterated that "[n]ot *all* conduct that poses a risk to the mental or physical health of a child is unlawful. Rather, there is an acceptable range of risk." (Emphasis in original; internal quotation marks omitted.) *State* v. *Maurice M.*, supra, 303 Conn. 42, quoting *State* v. *Scruggs*, supra, 279 Conn. 720.

We do not rule out the possibility that with another set of facts, a teacher properly could be substantiated as having emotionally abused a child based on behavior in the classroom. We cannot conclude, however, that the plaintiff in the present case could have been on notice that his cheek-pinching and name-calling behavior toward K could amount to child abuse within the meaning of § 46b-120 (3) as interpreted by the defendant's regulations. Accordingly, we conclude that, under these facts, § 46b-120 (3) is unconstitutionally vague as to the plaintiff's conduct.

The judgment is reversed and the case is remanded with direction to render judgment sustaining the plaintiff's appeal and to order the defendant to reverse the substantiation of emotional abuse and to remove the

[21] President Dwight D. Eisenhower, Address at Bradley University, Peoria, Illinois, September 25, 1956. President Eisenhower, the thirty-fourth president of the United States, graduated from West Point and commanded a tank training center during World War I. During World War II, he was appointed to the Army's war plans division and was later selected as supreme commander of allied forces in Western Europe. After the war, he retired to become President of Columbia University. He was elected president of the United States in 1952 and then re-elected in 1956. During his presidency, Eisenhower created the Department of Health, Education and Welfare in addition to the National Aeronautics and Space Administration.

plaintiff's name from the child abuse and neglect registry.

In this opinion the other judges concurred.