******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

NICHOLAS FRANK *v.* DEPARTMENT
OF CHILDREN AND FAMILIES
(SC 18980)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald and Espinosa, Js.

*Argued December 2, 2013—officially released July 8, 2014*

*Gregory T. D'Auria*, solicitor general, with whom were *John E. Tucker*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellant (defendant).

*John R. Williams*, for the appellee (plaintiff).

*Opinion*

EVELEIGH, J. The defendant in this administrative appeal, the Department of Children and Families (department), substantiated allegations of emotional abuse by the plaintiff, Nicholas Frank, an elementary school teacher, against one of his students, K,[1] and placed the plaintiff's name on the department's central registry of child abuse and neglect (central registry).[2] The department appeals, upon our grant of certification, from the judgment of the Appellate Court, reversing the trial court's judgment dismissing the plaintiff's appeal from the department's decision and remanding the case to the trial court with direction to sustain the plaintiff's appeal. See *Frank* v. *Dept. of Children & Families*, 134 Conn. App. 288, 315–16, 37 A.3d 834 (2012). The department contends on appeal that the Appellate Court improperly: (1) failed to give proper deference to the factual findings and legal conclusions of the administrative hearing officer; and (2) concluded that, as applied to the facts of the present case, the definition of "abused" found in General Statutes (Rev. to 2011) § 46b-120 (3)[3] is not unconstitutionally vague. We now reverse the judgment of the Appellate Court and remand the case to that court, with direction to affirm the trial court's judgment dismissing the plaintiff's appeal from the department's decision.

The department hearing officer found the following facts, which are not contested on appeal. During the fall of 2008, the plaintiff taught fifth and sixth grade at an elementary school in the New Haven Public School District (school district). K, a student in the plaintiff's sixth grade class, reported to his mother that the plaintiff was calling him names and pinching his cheeks. Specifically, K reported that the plaintiff had called K names such as "birthing mother," "cheeks" and a "fish out of water" and other students reported that the plaintiff called K "pregnant." K found the cheek pinching to be very painful because he had recently had metal bars implanted in his mouth. K also believed that the plaintiff used the cheek pinching to punish him. For example, the plaintiff would limit K to ten questions per day, and if K exceeded this limit, the plaintiff would ask K to choose between having his cheeks pinched and skipping lunch as a punishment.

In December, 2008, K's mother initially met with the principal of the school, Laura Russo,[4] and complained about the plaintiff's behavior. K and his mother reported that the name-calling and pinching was very upsetting to K, and that as a result K became afraid of going to school, his schoolwork suffered, he had trouble sleeping and suffered from bedwetting due to anxiety. Russo advised the plaintiff to have less contact with K and to cease this behavior. Ultimately, Russo ordered Andrea Lobo-Wadley, the school district's personnel director, to conduct an internal investigation of the accusations

by K and his mother against the plaintiff.[5] Lobo-Wadley's investigation included interviews with other students, which confirmed that the plaintiff had called K and other students names that could be hurtful and embarrassing. Lobo-Wadley's investigation also revealed that the plaintiff had previously received verbal warnings about his interactions with students, and had received a written warning in November, 2008, for calling another child a liar when the child complained that the plaintiff had called the child fat during a "boot camp" exercise.[6] As a result of Lobo-Wadley's investigation, the plaintiff was suspended for eight days without pay.[7]

The administrative record reveals that, following a meeting on May 19, 2009, Russo made a referral to the department and K's mother also independently made two referrals to the department. Each of these referrals was denied.[8] See footnote 5 of this opinion. Shortly after the plaintiff began serving his suspension, an article appeared in the New Haven Register reporting on the situation between K's mother, the plaintiff, and the school system. Another referral was made by K's mother at this time, which the department accepted. The department dispatched an investigator, Brooke Morris, to determine whether the plaintiff had abused K and whether it would be appropriate to place the plaintiff's name on the central registry. Morris' investigation resulted in factual findings similar to those made by Lobo-Wadley. On the basis of her investigation, Morris determined that the plaintiff had emotionally abused K, and substantiated the referral. Morris also recommended that the plaintiff's name be placed on the central registry.

The opinion of the Appellate Court provides the following relevant procedural history. "The [department] held an administrative hearing in [its] New Haven area office on December 21, 2009, and March 15, 2010, to determine whether to uphold the investigator's substantiation. The hearing officer heard testimony from Morris, Russo and the plaintiff and admitted the [department's investigation], the newspaper article and the plaintiff's personnel record into evidence. On April 30, 2010, the hearing officer rendered her final decision, upholding the substantiation against the plaintiff and ordering the placement of his name on the . . . central registry . . . .

"The plaintiff timely appealed from the hearing officer's determination to the trial court, which heard argument on November 10, 2010. In a memorandum of decision filed November 22, 2010, the court affirmed the decision of the hearing officer, finding that there was substantial evidence to support the hearing officer's decision and rejecting the plaintiff's void for vagueness challenge." *Frank* v. *Dept. of Children & Families*, supra, 134 Conn. App. 300.

The plaintiff next appealed to the Appellate Court,

claiming that: (1) the trial court should not have upheld the hearing officer's substantiation of child abuse and placement of his name on the central registry because those decisions were not supported by substantial evidence; and (2) § 46b-120 (3), as interpreted by the department, is unconstitutionally vague as applied to the plaintiff's conduct in this matter. Id., 292. The Appellate Court considered "the substantial evidence claim . . . to be inextricably intertwined with [the] claim that § 46b-120 (3) is void for vagueness as applied to [the plaintiff's] conduct" and, thus, addressed the former issue only as part of the vagueness issue. Id., 300–301 n.13. Perhaps because it considered the underlying evidentiary issue to be subsumed within the constitutional issue, the Appellate Court adopted a statement of facts in the case based on its own independent review of the record instead of limiting itself to the express findings of the hearing officer. Id., 293–300. Ultimately, the court concluded that the statutory term of abuse was void for vagueness as applied to the emotional abuse substantiation against the plaintiff. Id., 315. As a result, the Appellate Court reversed the judgment of the trial court and directed the trial court to render judgment sustaining the plaintiff's appeal from the administrative decision, and to order the department to remove the plaintiff's name from the central registry. Id., 315–16. This certified appeal followed.[9] Additional facts and procedural history will be set forth as necessary.

I

We first address the issue of whether the Appellate Court failed to properly credit the findings of the administrative hearing officer. The department argues on appeal that the Appellate Court substituted its own judgment for that of the trier of fact in this case, in disregard of well established principles of administrative law regarding the appropriate level of deference afforded to the findings of a hearing officer at an administrative hearing and the conclusions he or she draws from them. The department claims that, although the hearing officer's findings and conclusions were substantially supported by the evidence in the record, the Appellate Court "simply chose to credit the plaintiff's story" instead of the findings and conclusions of the hearing officer. The plaintiff, in response, argues that the Appellate Court implicitly credited specific factual findings made by the hearing officer in support of the department's substantiation of emotional abuse, which were found by the trial court to have been supported by substantial evidence in the record, but nonetheless determined that the statutory definition of abuse was too vague to put the plaintiff on notice that such facts could expose him to having his name placed on the central registry. The plaintiff does not challenge the sufficiency of the evidence to support these enumerated findings but, instead, contends that the hearing officer's ten enumerated factual findings were insufficient to

substantiate her ultimate finding of emotional abuse that effectively resulted in a sanction that caused a "tenured school teacher" to be considered "a child abuser who should be barred from the profession . . . ." The plaintiff relies on our decisions *Dolgner* v. *Alander*, 237 Conn. 272, 676 A.2d 865 (1996), and *Gupta* v. *New Britain General Hospital*, 239 Conn. 574, 687 A.2d 111 (1996), in support of this premise. We conclude that the Appellate Court did not implicitly credit the hearing officer's findings and, further, we conclude that, under the established standard to review an administrative decision, the record supports the trial court's conclusion that the department's decision was supported by substantial evidence. Therefore, we conclude that the Appellate Court improperly substituted its own findings for those of the department.

We begin with the standard of review. "[J]udicial review of the commissioner's action is governed by the [Uniform Administrative Procedure Act, General Statutes § 4-166 et seq. (UAPA)] . . . and the scope of that review is very restricted. . . . [R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . .

"The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. [See] General Statutes § 4-183 (j) (5) and (6). An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . . It is fundamental that a plaintiff has the burden of proving that the commissioner, on the facts before him, acted contrary to law and in abuse of his discretion . . . . The law is also well established that if the decision of the commissioner is reasonably supported by the evidence it must be sustained." (Citations omitted; internal quotation marks omitted.) *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, 288 Conn. 790, 833–34, 955 A.2d 15 (2008).

In the present case, substantial evidence in the administrative record supported the findings and conclusions of the hearing officer, most notably the information contained in exhibit 7, the internal investigation con-

ducted by Lobo-Wadley of the school district, and exhibit 4, the investigation conducted by the department's investigator, Morris. Specifically, in her decision following the administrative hearing, the hearing officer in this case made ten distinct factual findings, which were as follows:

"1. The [plaintiff] was a teacher at [the school] during the 2008–2009 school year, teaching fifth and sixth graders.

"2. Twelve year old [K] was a student at [the school] and had the [plaintiff] as a teacher.

"3. [K] reported that during the 2008–2009 school year, the [plaintiff] would call him names, including: 'cheeks,' because he has big cheeks and they are even more pronounced since he had metal bars put in his mouth to assist in straightening his teeth; 'birthing mother' as he is overweight; and 'fish out of water' because of the way he looked when trying to get his binder out from under his desk. [K] reported that he found the names offensive and embarrassing. He was sad and very hurt that the [plaintiff] called him names.

"4. [K] reported that the [plaintiff] would pinch his cheeks and this physically hurt due to the metal bars in his mouth. He reported he was afraid in class as he was afraid of what the [plaintiff] was going to say or do next to make fun of him. He reported [that] the [plaintiff] limited him to ten questions a day and if he exceeded the limit, he would either get lunch detention or the [plaintiff] would pinch his cheeks; [K] could choose the punishment.

"5. [K] reported he had good grades until he started feeling afraid in class. His grades then went from A's to C's. He reported he is upset and cannot concentrate. He has trouble sleeping and his mother reported he had started bedwetting right before he disclosed to her what was occurring in the classroom. [K] stated he had problems sleeping because he was always thinking about what was happening in the classroom.

"6. [K]'s mother had a meeting with school administrators in December, 2008, and relayed her concerns regarding the [plaintiff's] treatment of [K]. In addition to her concerns regarding the [plaintiff], [K's] mother also reported that [K] had been sexually abused by a family member and is very sensitive to the [plaintiff's] comments.

"7. The [plaintiff] was advised by [Russo] to have less contact with [K], stop calling him names and to stop pinching his cheeks.

"8. Other students in the class confirmed that the [plaintiff] called [K] names and that the [plaintiff] also called other students names. The students reported they believed the [plaintiff] was joking, but that sometimes he went too far and hurt students' feelings and embar-

rassed them. Other students reported the [plaintiff] said [K] was pregnant due to his weight.

"9. Following an investigation by the New Haven Board of Education, the [plaintiff] was suspended for eight days without pay, due in part to his actions and statements toward [K].

"10. According to [e]xhibit 7, the [plaintiff's] [e]mployment [r]ecord, the [plaintiff] had received prior verbal warnings regarding his comments to students. He received at least one written warning in November, 2008, for calling another child a liar when the child complained that the [plaintiff] had called him fat during a boot camp exercise. An investigation of the incident found that the [plaintiff] had called the child a turtle, not fat."

In addition to these enumerated findings, the hearing officer also made numerous additional factual findings, as well as several legal conclusions, when applying the relevant law, regulations, and policies to the situation at hand. The hearing officer, relying on the guidance provided by a department manual; see Dept. of Children and Families, Policy Manual § 34-2-7 (policy manual); concluded that the department had demonstrated by a fair preponderance of the evidence that the plaintiff had emotionally abused K. In making this determination, the hearing officer found, for example, that at least some of the plaintiff's behavior was directed at K due to K's weight. In addition, the hearing officer determined that, as a result of the plaintiff's behavior, other students in the class also began pinching K's cheeks until the plaintiff stated that this behavior was inappropriate. The hearing officer expressly found the plaintiff not to be credible insofar as he claimed that: (1) the emotional distress exhibited by K through his sleeping issues, bed-wetting, fear of school, and falling grades were not the result of the plaintiff's conduct, but instead due to sexual trauma previously inflicted on K by a third party; and (2) K and his mother were complaining of the plaintiff's conduct because of K's bad grades. Instead, the hearing officer noted that "[t]he record supports [that] a number of students confirmed that the [plaintiff] had a tendency to call students, including [K], derogatory names and that he often pinched [K's] cheeks. The record also supports a finding that [K's] mother maintained a close relationship with the school and tried to address problems as they arose. . . . [K's] mother approached school officials several times to address the [plaintiff's] statements and actions [toward K]. Her concern did not materialize after the poor grade was received, but did intensify after that as [K] continued to show signs of distress. The [plaintiff's] name-calling and cheek pinching resulted in [K] being fearful in class and having difficulty sleeping."

Having concluded that the plaintiff emotionally abused K, the hearing officer then determined that,

pursuant to § 34-2-8 of the policy manual, the department was warranted in placing the plaintiff's name on the central registry. Regarding the issue of intent, the hearing officer noted that the department "examines whether there is reason to believe the perpetrator had sufficient knowledge and resources, the ability to utilize them and an understanding of the implications for failing to provide appropriate care, but made a conscious decision not to do so." The hearing officer found that "[t]he record . . . supports a finding that the [plaintiff] had previously been advised by school administrators that it was inappropriate to call students names. The [plaintiff] had received verbal warnings and at least one written warning. In addition, as a teacher and an individual educated regarding child development issues, the [plaintiff] should have the knowledge and resources to understand the implications of failing to provide appropriate care to children. . . . The [plaintiff] should have been aware of the implication of his statements on students in his care. The record supports a finding that the [plaintiff] made a conscious decision to not provide appropriate care." (Footnote omitted.) The hearing officer also concluded that the record supported a conclusion that the plaintiff's actions had had a serious adverse impact on K, and that the plaintiff's behavior reflected a pattern or chronic nature of abuse, noting that "[t]he [plaintiff] called [K] names so often that the other students also started calling him the same or similar names."

In its decision dismissing the plaintiff's appeal, the trial court concluded that the administrative hearing officer's findings, and conclusions drawn therefrom, were supported by substantial evidence in the administrative record. The trial court concluded: "Exhibit 4, [the department's investigation conducted by Morris] supports the hearing officer's findings that the plaintiff called [K] embarrassing names and that other students heard these names. [Exhibit 7, the internal investigation conducted by Lobo-Wadley] contains a reprimand issued by the school district to the plaintiff for his treatment of [K], as well as an admission by the plaintiff that he makes such comments to keep the atmosphere in the classroom light and entertaining." The trial court continued: "The court also does not accept the policy argument made by the plaintiff that the placement of his name on the [central] registry list would wrongly interfere with teaching methods chosen to be employed by classroom teachers. The court defers to the conclusion of the hearing officer who noted that teachers [throughout] the school districts are on notice that poking fun at students is inappropriate behavior."

When one reads the opinion of the Appellate Court, it is immediately apparent that the panel omitted critical findings and conclusions of the hearing officer. For example, the Appellate Court acknowledged some of the less egregious name calling but did not acknowledge

that K accused the plaintiff of calling him names such as "birthing mother" or that other students in the class reported that the plaintiff called K "pregnant."[10] Similarly, the Appellate Court omitted the fact that the hearing officer concluded that the plaintiff called K by these names in reference to the child's weight. The Appellate Court also quoted selectively from the hearing officer's decision. For example, the Appellate Court acknowledged that "[t]he hearing officer's findings show that the plaintiff intended his nicknames and horseplay to be taken in a joking manner, and that is how K's classmates interpreted the plaintiff's actions, although the hearing officer noted that some students reported that 'sometimes [the plaintiff] went too far and hurt students' feelings and embarrassed them.'" *Frank* v. *Dept. of Children & Families*, supra, 134 Conn. App. 310. The Appellate Court omitted the next sentence in that same factual finding by the hearing officer: "Other students reported the [plaintiff] said [K] was pregnant due to his weight." Finally, the Appellate Court opinion not only failed to acknowledge that the hearing officer did not find the plaintiff's explanation for the allegations to be credible, it credited evidence that the hearing officer had rejected in connection with this credibility assessment. For example, the Appellate Court opinion notes that "[i]t was not until the plaintiff informed K's mother that K's grade in his class had been lowered because of K's failure to turn in his assignments that K's mother complained further about the plaintiff." *Frank* v. *Dept. of Children & Families*, supra, 310 n.17. The hearing officer expressly rejected this understanding of the motive behind the complaints of K's mother. In light of these omissions and inconsistencies with the administrative record, there is simply nothing to substantiate the plaintiff's claim that the Appellate Court implicitly credited the hearing officer's conclusions. The Appellate Court, therefore, manifestly failed to apply the proper standard of review. Accordingly, we now engage in the proper inquiry.

We now examine whether the factual findings of the hearing officer, and legal conclusions drawn therefrom, are supported by substantial evidence in the administrative record. The separate and independent investigations conducted by Morris and Lobo-Wadley reveal that K and other students in the class told adults that the plaintiff called K names such as "birthing mother" and told them that K was "pregnant." K and other students in the class considered these remarks to be derogatory references to K's weight. With regard to the plaintiff's pinching of K's cheeks, K reported that he had metal bars installed in his mouth and that "the inside of his cheeks would bleed after [the plaintiff] would pinch them as the bars were so close to the inside of his mouth." The plaintiff engaged in this conduct with such frequency that it prompted some of K's classmates to also pinch K's cheeks. K's mother stated that the school

was aware of the metal bars as she had notified the school of the procedure. On another occasion, K attempted to resist the plaintiff's attempt to pinch his cheeks and the plaintiff stepped on K's foot to prevent him from getting away, tackled him to the ground, placed a foot on his back, and then proceeded to pinch K's cheeks. K also reported that, unlike other students in the class, the plaintiff limited K to ten questions in class per day, and if K exceeded this limit "[K] would have lunch detention or [the plaintiff] would pinch [K's] cheeks" and that the plaintiff "would allow [K] to pick which punishment he wanted." Other students in the class observed that K had a visible reaction to the plaintiff's behavior, noting that "[K] would look sad, like he was going to cry, but he would try to laugh with everyone else." K and his mother reported that the plaintiff's behavior had affected K's sleeping patterns, his grades, and it also resulted in K exhibiting bedwetting behavior.

The department and internal school investigations of the plaintiff also demonstrated that the plaintiff's questionable behavior toward his students was not limited to the aforementioned conduct. Both investigations revealed that, for a time, the plaintiff created an activity called "The Mr. Frank Show," which one of the investigations describes as "like Jerry Springer with a microphone" in which "[k]ids get to talk about other kids on the microphone." Russo stopped this activity when she became aware of it. In addition, the plaintiff was disciplined in 2008 for an incident that occurred between him and another student. In that situation, the student reported to the school principal that the plaintiff and another teacher had called the student fat during a " 'Boot Camp' " drill. The plaintiff, who was present at the meeting with the school principal, "yell[ed] at [the student], point[ed] in his face and called him a liar." Another adult "pulled [the plaintiff] away from [the student]." Russo noted that the student later admitted that the plaintiff never used the word "fat" but had made him feel uncomfortable about his weight during the drill. Russo concluded, however, that "[t]he behavior displayed by [the plaintiff] was intimidating to the student and unnecessary. . . . I am going to make an [e]mployee [a]ssistance [p]rogram referral. [The plaintiff] has agreed to comply with my recommendation."

As discussed previously in this opinion, the hearing officer stated that she did not find the plaintiff's testimony regarding K's motivation for reporting the plaintiff's conduct to be credible and also concluded that the plaintiff had acted intentionally. For purposes of this issue, it is not appropriate to find that there is insufficient evidence in support of administrative findings simply because, as the Appellate Court noted in its opinion, "there is more than one possible explanation for K's state of mind during the relevant time period." *Frank* v. *Dept. of Children & Families*, supra, 134 Conn. App. 311. Nor is it sufficient to argue, as

the plaintiff does, that a conflict exists between the conclusion of the hearing officer and the conclusion of the school district after it conducted its own internal investigation that a brief suspension of the plaintiff was the appropriate sanction. "In determining whether an administrative finding is supported by substantial evidence, the reviewing court must defer to the agency's assessment of the credibility of witnesses. . . . The reviewing court must take into account contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . ." (Internal quotation marks omitted.) *Moraski* v. *Connecticut Board of Examiners of Embalmers & Funeral Directors*, 291 Conn. 242, 266–67, 967 A.2d 1199 (2009). Rather, the findings and conclusions of the hearing officer in the present case were supported by substantial evidence in the record, most notably the investigations set forth in exhibits 4 and 7. These investigations both contained descriptions of the plaintiff's past discipline and accounts by students regarding the plaintiff's behavior toward K and K's subsequent reaction to it. These reports not only supported the findings made by the hearing officer regarding the name-calling and physical conduct that the plaintiff inflicted on K, but also that K had experienced an adverse impact as a result of this behavior, which was evident to some of K's classmates. Although the record contained evidence that supported the plaintiff's position, primarily in the form of the plaintiff's own testimony, "[i]t is well established that it is the exclusive province of the trier of fact to make determinations of credibility, crediting some, all, or none of a given witness' testimony. . . . Additionally, [a]n administrative agency is not required to believe any witness, even an expert. . . . Nor is an agency required to use in any particular fashion any of the materials presented to it as long as the conduct of the hearing is fundamentally fair. . . . Questions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Citations omitted; internal quotation marks omitted.) *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, supra, 288 Conn. 830. Accordingly, the trial court properly concluded that the ultimate finding of the hearing officer, substantiating the allegation of emotional abuse against the plaintiff, was supported by substantial evidence.

We do not find persuasive the plaintiff's argument that the trial court's conclusion is contrary to our decision in *Dolgner*. The plaintiff argues that in *Dolgner*, this court refused to uphold a finding of emotional

abuse, when in that case a day care provider had been alleged to have subjected children in her care to "humiliating and frightening treatment and punishment . . . ." *Dolgner* v. *Alander*, supra, 237 Conn. 277. The plaintiff misconstrues the basis for our decision in that case. In *Dolgner*, this court concluded that the decision of the Commissioner of Human Resources to revoke the plaintiff's license that permitted her to run a day care center out of her home was not supported by substantial evidence. Id., 273. In that case, however, we based our decision primarily due to the following concerns: "The evidence presented at the [administrative] hearings failed to disclose the factual particulars regarding inappropriate conduct that had occurred at the plaintiff's family day care home, the dates on which inappropriate conduct occurred, the frequency of inappropriate conduct or any other details concerning the plaintiff's alleged violations . . . . Moreover, although the . . . case summary [of the Department of Human Resources] disclosed the age of one of the children who had reported abusive treatment, no other evidence disclosed the ages of the children who had reported inappropriate conduct." Id., 282. This court continued: "Although the reports prepared by [the Department of Human Resources] and the . . . police . . . contained the specific factual foundation of the plaintiff's alleged misconduct, neither report was introduced into evidence at the administrative hearings. In the absence of such basic factual predicates, the hearing officer was not provided with an opportunity to assess and to weigh independently and adequately the accuracy and the reliability of the evidence presented." Id. Unlike the situation in *Dolgner*, the record in the present case, particularly those portions discussed previously in this opinion, was replete with evidence containing the specific factual foundation underlying the department's decision to substantiate the charge of child abuse against the plaintiff and recommend that his name be placed on the central registry.

We also reject the plaintiff's contention that neither courts nor the department should be "second-guessing the judgment of the New Haven Board of Education, which has fully investigated and decided this matter . . . ." The plaintiff analogizes the present situation to the one presented to this court in *Gupta* v. *New Britain General Hospital*, supra, 239 Conn. 590. We do not find the situations to be comparable. In *Gupta*, the dispute arose when the plaintiff, a surgical resident, was dismissed in what he claimed was a breach of the residency agreement between the plaintiff and the defendant hospital. Id. In part, the plaintiff claimed that the defendant had breached the agreement by failing to provide him with adequate training. Id. We noted that the plaintiff's claim in *Gupta* raised issues such as standard of care, the existence of a duty, and reasonableness that "are difficult, if not impossible, to apply in the academic

environment"; id., 591; and, partially for this reason, we concluded that "[j]udicial noninterference is especially appropriate in cases like the present one, in which the focus of a breach of contract claim is an allegedly inadequate residency program." Id., 592. By contrast, with regard to the present case, the legislature has made it quite plain by creating the central registry and its surrounding regulatory scheme that potentially abusive practices by teachers or other persons that fall within the ambit of that scheme are subject to regulation by the department and, to a lesser extent, the courts. The central registry statutory scheme at issue plainly applies to persons entrusted with the care of a child or youth. See General Statutes (Supp. 2014) § 17a-101g (a) (describing investigative steps taken by department when reported abuser is "person entrusted with the care of a child"); General Statutes (Supp. 2014) § 17a-101g (d) (providing when such report of abuse warrants placement of abuser's name on central registry); General Statutes (Supp. 2014) § 17a-101k (a) (providing that department is required to maintain central registry of findings of abuse pursuant to § 17a-101g). The legislature has defined the term " '[p]erson entrusted with the care of a child or youth' " to mean "a person given access to a child or youth by a person responsible for the health, welfare or care of a child or youth *for the purpose of providing education*, child care, counseling, spiritual guidance, coaching, training, instruction, tutoring or mentoring of such child or youth." (Emphasis added.) General Statutes (Supp. 2014) § 17a-93 (15).[11] The hearing officer in this case determined that the plaintiff was such a person, and the plaintiff has not challenged this classification on appeal. Moreover, the legislature has expressly given the department the authority to adopt regulations to implement the central registry. See General Statutes (Supp. 2014) § 17a-101k (i). Thus, the legislature has plainly expressed a desire for potentially abusive conduct between teachers and the minor children with whom they have been entrusted to be subject to some degree of supervision.

II

Having concluded that the ultimate finding of the hearing officer, substantiating the allegation of emotional abuse against the plaintiff, was supported by substantial evidence, we now turn to the second issue: whether the definition of "abused" found in § 46b-120 (3) is void for being unconstitutionally vague as applied to the facts of the present case. The department claims that the Appellate Court improperly determined that the relevant term, "emotional abuse," is void for vagueness. Specifically, the department claims that the term is not unconstitutionally vague when one examines the department's regulations and policy manual in combination with the remainder of the statutory scheme and relevant case law. Moreover, the department contends that, as an educator, the plaintiff should have been

on fair notice that his conduct would fall within the statutory definition of "abuse," particularly in light of Connecticut's anti-bullying statute.[12] In response, the plaintiff claims that the Appellate Court correctly held that § 46b-120 (3) is unconstitutionally vague as applied to the facts in the present case because "the plaintiff . . . could [not] have been on notice that his cheek-pinching and name-calling behavior toward K could amount to child abuse within the meaning of § 46b-120 (3) as interpreted by the [department's] regulations." *Frank* v. *Dept. of Children & Families*, supra, 134 Conn. App. 315. We agree with the department.

"As a threshold matter, it is necessary to discuss the applicable standard of review. A statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning." (Citations omitted; internal quotation marks omitted.) *Ferreira* v. *Pringle*, 255 Conn. 330, 355–56, 766 A.2d 400 (2001). "[T]he degree of vagueness that the [c]onstitution tolerates . . . depends in part on the nature of the enactment. . . . The [United States Supreme Court] has . . . expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. . . . Therefore, [c]ivil statutes . . . may survive a vagueness challenge by a lesser degree of specificity than in criminal statutes." (Citation omitted; internal quotation marks omitted.) *Hogan* v. *Dept. of Children & Families*, 290 Conn. 545, 575, 964 A.2d 1213 (2009), quoting *Gonzalez* v. *Surgeon*, 284 Conn. 573, 583–84, 937 A.2d 24 (2007).

Before reaching the merits of our analysis, we refer to this court's earlier decision in *Hogan* v. *Dept. of Children & Families*, supra, 290 Conn. 568–70,[13] in which we previously rejected a different vagueness challenge to the constitutionality of the central registry scheme, to provide background information: "The registry scheme is codified in two sections that work in tandem: General Statutes [Rev. to 2007] §§ 17a-101g and 17a-101k. [General Statutes (Rev. to 2007)] § 17a-101g sets forth the [department's] responsibilities upon receiving a report of abuse or neglect of a child: classification; evaluation; investigation; and determination of whether abuse or neglect has occurred. General Statutes [Rev. to 2007] § 17a-101g (a) and (b). The statute

directs that, '[i]f the [C]ommissioner [of Children and Families] determines that abuse or neglect has occurred, the commissioner shall also determine whether: (1) [t]here is an identifiable person responsible for such abuse or neglect; and (2) such identifiable person poses a risk to the health, safety or well-being of children and should be recommended by the commissioner for placement on the child abuse and neglect registry established pursuant to section 17a-101k.' General Statutes [Rev. to 2007] § 17a-101g (b)." "Certain findings of abuse may result in the placement of an abuser's name on the [central] registry even prior to exhaustion of administrative remedies: '[i]f the child abuse or neglect resulted in or involves [inter alia] . . . the risk of serious physical injury or emotional harm of a child . . . .' General Statutes [(Rev. to 2007) § 17a-101g (d)]." *Hogan* v. *Dept. of Children & Families*, supra, 573–74. "The [department] is directed under [General Statutes (Rev. to 2007)] § 17a-101k (i) to adopt regulations to implement the provision of that statute." Id., 570.

The definition of "abuse" in § 17a-101g (b) incorporates, by reference, the definition of "abused" in § 46b-120 (3).[14] General Statutes § (Rev. to 2011) 46b-120 (3), in turn, defines "abused" to mean "that a child or youth (A) has been inflicted with physical injury or injuries other than by accidental means, (B) has injuries that are at a variance with the history given of them, or (C) is in a condition that is the result of maltreatment, including, but not limited to, malnutrition, sexual molestation or exploitation, deprivation of necessities, emotional maltreatment, or cruel punishment . . . ."

With this understanding in mind, we turn to the merits of this issue, namely, the question of whether the definition of "abused" set forth in § 46b-120 (3) is void for vagueness as applied to the present circumstances. We begin with the plaintiff's challenge to the department's policy manual as an appropriate source of notice. Although the plaintiff claims that "there is no indication in the record that [the department's policy] manual has the force of law," Connecticut courts, including this court, have previously approved of using the policy manual as a reference in the absence of guidance in the relevant statutory provisions or regulations. See, e.g., *Hogan* v. *Dept. of Children & Families*, supra, 290 Conn. 576 n.16 (noting that trial courts consider policy manual to be part of relevant scheme); *Lovan C.* v. *Dept. of Children & Families*, 86 Conn. App. 290, 295, 860 A.2d 1283 (2004) (citing § 34-2-7 of policy manual for examples of term "physical injury" when determining whether child had been "abused" within definition of § 46b-120); *Giordano-Little* v. *Dept. of Children & Families*, Superior Court, judicial district of New Britain, Docket No. CV-07-4012612-S (January 29, 2008) (reviewing finding of emotional neglect under § 34-2-7 of policy manual); *Handleman* v. *Dept. of Children &*

*Families*, Superior Court, judicial district of New Britain, Docket No. CV-06-4012364-S (January 11, 2008) (relying on § 34-2-7 of policy manual to supply definition of "emotional abuse or maltreatment"); *Adams* v. *Dept. of Children & Families*, Superior Court, judicial district of New Britain, Docket No. CV-06-4011617-S (February 26, 2007) (noting that hearing officer relied on § 34-2-7 of policy manual for definitions of "sexual abuse" and "emotional abuse"); *Rucci* v. *Dept. of Children & Families*, Superior Court, judicial district of New Britain, Docket No. CV-02-0516990-S (November 5, 2003) (36 Conn. L. Rptr. 7, 9) (noting that § 34-2-7 of policy manual "provides operational definitions of child abuse and neglect" and interpreting subsection defining terms "physical abuse" and "physical injury"). In *Hogan*, we concluded that reliance on the policy manual was appropriate, despite the fact that the policy manual was not formally promulgated, because the provisions at issue were substantially the same as pending formally promulgated regulations, the policy manual effectively served as a gap filler, and the policy manual is published by the defendant and, thus, available for viewing by the public.[15] See *Hogan* v. *Dept. of Children & Families*, supra, 576 and n.16.

Recently, however, this court underscored that an agency interpretation, whether of its own regulations or of a statute that the agency is charged with enforcing, is not accorded deference by the court when it has not been "promulgated pursuant to any formal rule-making procedures or articulated pursuant to any adjudicatory procedures, has not been time-tested or subject to judicial review in this state." (Footnote omitted.) *Sarrazin* v. *Coastal, Inc.*, 311 Conn. 581, 611, 89 A.3d 841 (2014). Thus, in *Sarrazin*, we declined to accord deference to the Department of Labor's interpretation of one of its own regulations in a published guidebook for the public.[16] Id., 611–12. Nonetheless, for purposes of the present case, reliance on the policy manual is appropriate for several reasons. First, the question in the present case is fair notice. Our courts previously had relied on the policy manual in construing the same term at issue in the present case. Thus, the plaintiff was on notice of the courts' reliance on the policy manual at the time of the conduct in question. Second, as we explain subsequently in this opinion, the department's definitions in the policy manual are wholly consistent with the common meaning of the term at issue, as well as other statutory terms relevant to the present case. Therefore, we begin with the policy manual.

In this case, the relevant provision of the policy manual is located in § 34-2-7. This section defines emotional maltreatment and abuse to include "act(s), statement(s), or threats, which has had, or is likely to have an adverse impact on the child and/or interferes with a child's positive emotional development." Policy Manual, supra, § 34-2-7. This section further indicates that

"evidence" of such abuse is ongoing if it includes the following types of behavior: "rejecting"; "degrading"; "isolating and/or victimizing a child by means of cruel, unusual, or excessive methods of discipline"; and "exposing the child to brutal or intimidating acts or statements." Id. Similarly, the section indicates that evidence a child has suffered an adverse impact from such behavior includes, inter alia, the following signs: "depression"; "withdrawal"; "low self-esteem"; "anxiety"; "fear"; "sleep disturbances"; "academic regression"; and "trust issues." Id.

As noted previously in this opinion, trial courts have relied on this specific provision when evaluating whether particular conduct qualifies as "abuse" for purposes of the central registry regulatory scheme. In fact, at least one trial court has relied on this specific provision to uphold a claim of emotional abuse by a teacher based on similar conduct. See *Handleman* v. *Dept. of Children & Families*, supra, Superior Court, Docket No. CV-06-4012364-S (The court affirmed the substantiation of emotional abuse and placement of the plaintiff on the central registry when "numerous witnesses repeated identical stories that [the plaintiff] shoved the sobbing child out of her classroom, while screaming at him to get out of her room . . . seeing her yell at the child, who was again in tears at the school market place . . . . [T]he hearing officer concluded that the [plaintiff's] actions [toward] the child had a negative impact on the child's behavior who 'was frequently crying, sobbing and complaining about no longer wish[ing] to attend school.' "); cf. *Medina* v. *Dept. of Children & Families*, Superior Court, judicial district of New Britain, Docket No. CV-07-4013879-S (November 14, 2007) (upholding substantiation of physical and emotional neglect against group home employee when allegations included choking and use of profanity against child living in group home in such manner so that child felt "scared and unsafe").

This definition is consistent with other authoritative published sources. In January, 2008, prior to the conduct at issue in the present case, the Centers for Disease Control and Prevention (centers) published uniform definitions for child maltreatment. The centers defined "psychological abuse," which it noted also included the term "emotional abuse," to mean "[i]ntentional caregiver behavior . . . that conveys to a child that he/she is worthless, flawed, unloved, unwanted, endangered, or valued only in meeting another's needs."[17] R. Leeb et al., Centers for Disease Control and Prevention, Child Maltreatment Surveillance: Uniform Definitions for Public Health and Recommended Data Elements (2008) pp. 16, 70.[18] The centers included, among others, the following behavior as examples of emotional maltreatment: "[b]elittling the child"; "[d]egrading the child"; "[s]purning the child"; and "[b]ehaving in a manner that is harmful . . . or insensitive to the child's

developmental needs." Id., p. 69. Similarly, Merriam-Webster's Collegiate Dictionary (10th Ed. 1993) defines "abuse," when used as a noun, to mean "language that condemns or vilifies usu[ally] unjustly, intemperately, and angrily" or, when used as a verb, "to use so as to injure or damage" and "to attack in words . . . ." These definitions of abuse, which were published before the plaintiff engaged in the conduct at issue as determined by the hearing officer, serve as additional resources through which the plaintiff could have become aware that his conduct could be considered emotional abuse within the meaning of § 46b-120 (3).

Furthermore, the language contained in other statutes reinforces this conclusion. The anti-bullying statute in effect during the time period relevant to the present case included in its definition of "bullying" any "overt acts by a . . . group of students directed against another student with the intent to ridicule, harass, humiliate or intimidate the other student while on school grounds . . . which acts are committed more than once against any student during the school year." Public Acts 2008, No. 08-160, § 4; see also footnote 12 of this opinion. Although the statute is expressly directed at student conduct intended to cause harm, it directs teachers to take an active role in preventing and responding to bullying. Pursuant to the statute, schools are required to create "safe school climate plans" that outline the steps that teachers and staff are to take in order to minimize or, ideally, eliminate bullying. Public Acts 2008, No. 08-160, §§ 4 and 5. In addition, the registry scheme implicitly acknowledges that abuse short of causing severe emotional harm can result in the abuser's placement on the central registry because, in cases of serious physical or emotional harm the abuser's name can be placed in the central registry even prior to exhaustion of administrative remedies. See General Statutes (Supp. 2014) § 17a-101g (d).

In light of these sources of information, we readily find that the plaintiff had fair notice that his conduct could qualify as emotional abuse. The plaintiff, as K's teacher, was placed into a unique position to have an impact on K's life. A young person's experience at school shapes his or her identity. School is where our youths learn about the world, how to interact with one another, how to work together, and how to form ties with people inside of a community infused with many cultures. In this setting, the plaintiff made frequent, degrading comments or references to K's weight and caused K further physical and mental pain by pinching his cheeks. The plaintiff did this despite the fact that it was quite clear to both other children in the classroom and K's mother that this behavior had a visible negative effect on K. The plaintiff's conduct continued to the point that, according to the report authored by Lobo-Wadley, other children joined in and carried out similar behavior against K. In acting as he did, the plaintiff,

thus, essentially encouraged other students within the class to aid him in causing K emotional harm. Such behavior can only be categorized as "isolating," as it is used in § 34-2-7 of the policy manual, and it quite plainly had a visible, profoundly negative impact on K. It should be obvious to anyone, let alone a professional educator, that this type of behavior—the targeting of a particular student's physical characteristics in a demeaning and hurtful way—would readily fall within the terms "degrading" or "victimizing" as they are used within § 34-2-7 of the policy manual.

We conclude that the definition of "abused" found in § 46b-120 (3), read in light of the policy manual, related statutes, and the existing case law of Connecticut courts on the subject, provided sufficient specificity so as to give the plaintiff adequate notice that his conduct might lead his name to be placed on the central registry.[19]

We respectfully disagree with the Appellate Court that our decision in *State* v. *Scruggs*, 279 Conn. 698, 905 A.2d 24 (2006), warrants a determination that the term "abused" as defined in § 46b-120 (3) is void for vagueness as applied to the plaintiff. See *Frank* v. *Dept. of Children & Families*, supra, 134 Conn. App. 308–309. In *Scruggs*, the defendant was subjected to a criminal prosecution when the defendant's child committed suicide. See *State* v. *Scruggs*, supra, 700–703. The defendant was convicted by a jury of one count of risk of injury to a child pursuant to General Statutes (Rev. to 2005) § 53-21 (a) (1)[20] and the trial court denied her subsequent motion for judgment of acquittal because it "conclud[ed] that the jury reasonably could have found that, by maintaining a cluttered and unclean residence, the defendant wilfully had caused her son . . . to be placed in a situation that was likely to injure his mental health." Id., 700. We concluded that the statute as applied to the defendant was vague, in part because the state had failed to show that the defendant had had *any* notice, including notice from "statutes, published or unpublished court opinions in this state or from other jurisdictions, newspaper reports, television programs or other public information that would support a conclusion that the defendant should have known that the conditions in her apartment posed an unlawful risk to the mental health of a child." Id., 719. We have already noted that the department's published policy manual, relevant statutes, and earlier Connecticut case law on the substantiation of reports of emotional abuse by teachers would have provided the plaintiff with notice that his conduct might result in the placement of his name on the central registry.

In sum, we conclude that the Appellate Court improperly failed (1) to give deference to the factual findings made by the hearing officer and the factually supported legal conclusions drawn therefrom, and (2) to give con-

sideration to sources of information available to the plaintiff that provided him with adequate notice that his conduct toward K would be considered abuse as defined in § 46b-120 (3) and thus potentially result in his name being placed on the central registry.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to render judgment affirming the judgment of the trial court dismissing the plaintiff's appeal.

In this opinion the other justices concurred.

[1] In view of this court's policy of protecting the privacy interests of juveniles, we refer to the child involved in this matter as K. See *Frank* v. *Dept. of Children & Families*, 134 Conn. App. 288, 293 n.4, 37 A.3d 834 (2012).

[2] As we discuss in further detail later in this opinion, General Statutes (Supp. 2014) § 17a-101k requires the department to maintain a central registry of the names of certain individuals whom the department has found to have abused or neglected children pursuant the investigative process set forth in General Statutes (Supp. 2014) § 17a-101g.

We note that §§ 17a-101g and 17a-101k have been the subject of recent amendments by our legislature that are not relevant to the present appeal. See, e.g., Public Acts 2013, No. 13-54, §§ 1, 2. For the sake of simplicity, all references to §§ 17a-101g and 17a-101k in this opinion, unless otherwise noted, are to the versions of those statutes appearing in the 2014 supplement to the General Statutes.

[3] General Statutes (Rev. to 2011) § 46b-120 (3) defines " '[a]bused' " to mean "that a child or youth (A) has been inflicted with physical injury or injuries other than by accidental means, (B) has injuries that are at variance with the history given of them, or (C) is in a condition that is the result of maltreatment, including, but not limited to, malnutrition, sexual molestation or exploitation, deprivation of necessities, emotional maltreatment or cruel punishment . . . ." The definition of "abused" found in § 46b-120 (3) is applicable to the present case because the section is expressly referenced in the statute that provides the criteria used to determine when a report of child abuse must be made; see General Statutes (Supp. 2014) § 17a-101a (a) ("[a]ny mandated reporter, as defined in section 17a-101, who in the ordinary course of such person's employment or profession has reasonable cause to suspect or believe that any child under the age of eighteen years [1] has been abused or neglected, as defined in section 46b-120"); and the statute that provides the criteria for when the department should substantiate a reported case of child abuse and whether the offender's name should be placed on the central registry. See General Statutes (Supp. 2014) § 17a-101g (b) ("After an investigation into a report of abuse or neglect has been completed, the commissioner shall determine, based upon a standard of reasonable cause, whether a child has been abused or neglected, as defined in section 46b-120. If the commissioner determines that abuse or neglect has occurred, the commissioner shall also determine whether: [1] There is an identifiable person responsible for such abuse or neglect; and [2] such identifiable person poses a risk to the health, safety or well-being of children and should be recommended by the commissioner for placement on the child abuse and neglect registry established pursuant to section 17a-101k.").

We note that § 46b-120 has been amended multiple times since the events underlying the present appeal, including two amendments that renumbered the subsections relevant to the present appeal. See, e.g., Public Acts, Spec. Sess., June, 2007, No. 07-4, § 73 (effective January 1, 2010); Public Acts 2011, No. 11-240, § 2 (effective July 1, 2011). In light of the fact that these amendments are not relevant to the present appeal, we refer to the 2011 revision of the statute for the sake of consistency with the Appellate Court opinion. See *Frank* v. *Dept. of Children & Families*, supra, 134 Conn. App. 292 n.2.

We also note that § 17a-101a has been amended by our legislature since the events underlying the present appeal. See, e.g., Public Acts 2013, No. 13-297, § 2. These amendments, however, are also not relevant to the present appeal. Consequently, all references to § 17a-101a within this opinion are to the version appearing in the 2014 supplement to the General Statutes.

[4] We note that portions of the record in the present case also refer to the principal by the name Laura Lynn. For the sake of simplicity, we refer to her throughout this opinion as Russo.

[5] The administrative record reveals that, following Russo's warning to the plaintiff to cease calling K names and pinching his cheeks, Russo asked K's mother if there had been any further issues between K and the plaintiff, and K's mother informed Russo that K had not reported any new incidents. By February, 2009, however, K's grades continued to suffer, and K's mother informed Russo that she believed that the plaintiff was retaliating against K and his mother for bringing his earlier behavior to Russo's attention. In April, 2009, K's mother again complained to Russo about the plaintiff, stating that the behavior toward K had continued. An additional meeting was scheduled for May 5, 2009, between K's mother, Russo, the plaintiff, Daniel Diaz, who served as the school's parent advocate, and Charles Warner, who was an administrator at the school district's central office. At this meeting, K's mother again raised her concerns regarding the plaintiff's behavior toward her son. Warner cut the meeting short, and informed K's mother to file a police report if she was concerned about the plaintiff's behavior toward K, which K's mother subsequently did. Following an additional meeting on May 19, 2009, between K's mother, Russo, the plaintiff, Lobo-Wadley, and Leah Pacini, another administrator with the school district's central office, Russo made a referral to the department and ordered Lobo-Wadley to conduct an internal investigation. The department did not accept Russo's referral.

[6] In this instance, an investigation into the matter determined that the plaintiff had not called the child fat, he had called him a turtle.

[7] The administrative record also reveals that, as a result of these events, the plaintiff was to be transferred to a different school in the fall of 2010.

[8] The parties have not pointed us to any information contained in the administrative record to explain the basis for the denial of these earlier referrals. In the absence of such information, we decline to speculate as to the reasoning employed by the department in declining to accept these earlier referrals.

[9] We granted the department's petition for certification to appeal limited to the following questions: (1) "Did the Appellate Court properly reverse the judgment of the trial court or did it fail to properly credit the findings of the hearing officer?" and (2) "If the answer to the first question is in the affirmative, did the Appellate Court properly determine that . . . § 420b-120 (3) is unconstitutionally vague as applied to the plaintiff's conduct in the classroom regarding one of his students, because the plaintiff could not have been on notice that his behavior could be considered 'emotional abuse' as defined by the [department's] regulations?" *Frank* v. *Dept. of Children & Families*, 305 Conn. 909, 909–10, 45 A.3d 97 (2012).

[10] Instead, the Appellate Court opinion states only that K's mother believed that K "had become sensitive to the use of nicknames by the plaintiff, including the name, 'cheeks,' and, 'fish out of water,' and to the pinching of his cheeks by the plaintiff." *Frank* v. *Dept. of Children & Families*, supra, 134 Conn. App. 294.

[11] We note that § 17a-93 has been amended by our legislature multiple times since the events underlying the present appeal. See, e.g., Public Acts 2013, No. 13-40, § 3. These amendments, however, are not relevant to the present appeal. For the sake of simplicity, all references to § 17a-93 within this opinion are to the version appearing in the 2014 supplement to the General Statutes.

[12] Section 4 of No. 08-160 of the 2008 Public Acts, which amended Connecticut's anti-bullying statute, General Statutes (Rev. to 2007) § 10-222d, sets forth the statutory language in effect during the time period relevant to the present case. It provides in relevant part: "Each local and regional board of education shall develop and implement a policy to address the existence of bullying in its schools. Such policy shall . . . (3) require teachers and other school staff who witness acts of bullying or receive student reports of bullying to notify school administrators in writing . . . (5) include a prevention and intervention strategy . . . for school staff to deal with bullying, (6) provide for the inclusion of language in student codes of conduct concerning bullying . . . [and] (9) direct the development of case-by-case interventions for addressing repeated incidents of bullying against a single individual or recurrently perpetrated bullying incidents by the same individual that may include both counseling and discipline . . . . For purposes of this section, 'bullying' means any overt acts by a student or a group of students directed against another student with the intent to ridicule, harass, humiliate or intimidate the other student while on school grounds, at a school-sponsored activity, or on a school bus, which acts are committed more than once against any student during the school year. . . ." Public

Acts 2008, No. 08-160, § 4. Section 5 of Public Act 08-160 provides in relevant part: "[t]he term 'prevention and intervention strategy' may include, but is not limited to . . . (4) school rules prohibiting bullying, harassment and intimidation and establishing appropriate consequences for those who engage in such acts . . . [and] (8) school-wide training related to safe school climate . . . ."

[13] We observe that this court's decision in *Hogan* was released after the events giving rise to the current dispute took place. The conduct giving rise to the issue in *Hogan*, however, occurred well before the plaintiff engaged in the conduct at issue in the present case. See *Hogan* v. *Dept. of Children & Families*, supra, 290 Conn. 551–53 (noting that alleged abusive conduct engaged in by plaintiff occurred in 1998, and that the administrative hearing upholding in part department's substantiation of physical abuse against plaintiff occurred in 2005); see also *Hogan* v. *Dept. of Children & Families*, Superior Court, judicial district of New Britain, Docket No. CV-06-4012236-S (August 3, 2007), rev'd, *Hogan* v. *Dept. of Children & Families*, supra, 290 Conn. 582. Our decision in *Hogan* examined portions of the central registry regulatory scheme as it existed at the time that the conduct giving rise to the present case occurred. Thus, we at times make reference to our decision in *Hogan* in this opinion as it provides some insight as to the workings of the regulatory scheme and the accessibility of information about the scheme that would have been available to the plaintiff in the years leading up to the events in question in the present case. In making these references, we do not intend to suggest that our decision in *Hogan*, in and of itself, provided any notice to the plaintiff that his conduct might have fallen within the relevant statutory definition of "abuse."

[14] General Statutes (Supp. 2014) § 17a-101g (b) provides in relevant part: "After an investigation into a report of abuse or neglect has been completed, the commissioner shall determine, based upon a standard of reasonable cause, whether a child has been abused or neglected, as defined in section 46b-120. If the commissioner determines that abuse or neglect has occurred, the commissioner shall also determine whether: (1) There is an identifiable person responsible for such abuse or neglect; and (2) such identifiable person poses a risk to the health, safety or well-being of children and should be recommended by the commissioner for placement on the child abuse and neglect registry established pursuant to section 17a-101k. If the commissioner has made the determinations in subdivisions (1) and (2) of this subsection, the commissioner shall issue notice of a recommended finding to the person suspected to be responsible for such abuse or neglect in accordance with section 17a-101k."

[15] Section 34-2-7 of the policy manual is available to the public on the department's website, and the webpage reflects that the section has not been modified since November 15, 2007. See Policy Manual, supra, § 34-2-7 (last modified November 15, 2007), available at http://www.ct.gov/dcf/cwp/view.asp?a=2639&Q=393928 (last visited June 25, 2014).

[16] We note that the guidebook in *Sarrazin* was intended to provide guidance to the public, in particular employers, whereas the department's policy manual is, by its express terms, intended to guide the conduct of its employees in assessing and responding to allegations of abuse and neglect. See Connecticut Department of Labor, "A Guide to Wage and Workplace Standards Division and Its Laws" (Rev. 2014) p. i (noting guide provided to assist employers); Policy Manual, supra, § 1-3-1 ("[t]he [p]olicy [m]anual is a primary staff tool covering legal requirements and agency mandates and is to be used as a reference for informed decision-making").

[17] Although neither party has suggested that this particular definition would have given the plaintiff notice that his conduct might qualify as "abuse" within the meaning of § 46b-120 (3), this court has previously observed that the vagueness doctrine requires "what Justice Holmes spoke of as fair warning . . . in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear. . . . [L]aws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." (Citations omitted; internal quotation marks omitted.) *Packer* v. *Board of Education*, 246 Conn. 89, 99–100, 717 A.2d 117 (1998). In other cases examining the vagueness doctrine, we have looked to public sources of information to see if they could have provided an actor with notice that his or her behavior could fall within the bounds of the applicable statute. See, e.g., *State* v. *Indrisano*, 228 Conn. 795, 809–10, 640 A.2d 986 (1994) (citing dictionary to provide common meaning of statutory terms); *State* v. *Scruggs*, 279 Conn. 698, 719, 905 A.2d

24 (2006) (finding statute at issue unconstitutionally vague as applied to defendant, noting that "[t]he state has pointed to no statutes, published or unpublished court opinions in this state or from other jurisdictions, newspaper reports, television programs or other public information that would support a conclusion that the defendant should have known that the conditions in her apartment posed an unlawful risk to the mental health of a child").

[18] In a footnote, the authors noted that this definition was adapted from the Practice Guidelines of the American Professional Society on the Abuse of Children, which was published in 1995. R. Leeb et al., supra, p. 16 n.12.

[19] We reiterate that the stated legislative purpose of the central registry is "to prevent or discover abuse of children . . . ." (Internal quotation marks omitted.) *Hogan* v. *Dept. of Children & Families*, supra, 290 Conn. 573. As a result, for this court "to require the [department] to delineate every act that would lead to placement of a person's name on the registry would be impracticable when the issue is a prediction of risk." Id., 577.

[20] General Statutes (Rev. to 2005) § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony . . . ."